## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

_____
                                                            )
UNITED STATES OF AMERICA, *ex rel.*   )
ROBIN WHITE,                                             )
                                                            )          Civil Action No. 13-1109-RGA
                              Plaintiff,                )
              v.                                            )
                                                            )
ORTHOPAEDIC AND NEURO                       )
IMAGING LLC, and RICHARD                     )
PFARR.                                                    )
                                                            )
                              Defendants.             )
_____)

## BRIEF OF UNITED STATES IN SUPPORT OF
## UNITED STATES' AND ROBIN WHITE'S JOINT MOTION FOR
## <u>DEFAULT JUDGMENT AND TO SET RELATOR'S SHARE</u>

**DAVID C. WEISS**
**Acting United States Attorney**

**By: Jennifer Hall (#5122)**
**Laura Hatcher (#5098)**
**Assistant United States Attorneys**
**1007 N. Orange Street, Suite 700**
**Wilmington, Delaware 19801**
**(302) 573-6277**

**Dated: January 12, 2018**

## TABLE OF CONTENTS

I.   NATURE AND STAGE OF THE PROCEEDINGS ........................................................ 1

II.  SUMMARY OF THE ARGUMENT ........................................................................... 1

III. STATEMENT OF FACTS .......................................................................................... 1

    A.   Medicare Background ........................................................................................ 1

    B.   ONI Lewes ........................................................................................................ 4

    C.   ONI Seaford ...................................................................................................... 7

    D.   ONI Millsboro ................................................................................................. 10

    E.   ONI Salisbury ................................................................................................. 12

IV.  ARGUMENT ........................................................................................................... 12

    A.   The allegations in the government's Complaint establish liability under the FCA. ......... 13

        1.   Defendants presented or caused to be presented claims for payment. .......................... 14

        2.   The claims were false. .................................................................................. 15

        3.   Defendants knew the claims were false. ...................................................... 16

        4.   Defendants' misrepresentations were material. ........................................... 17

    B.   The treble damages and civil penalties sought by the government are capable of ascertainment by the Court. ........................................................................... 18

    C.   The government and Relator agree that Relator should receive an 18-percent share under the FCA's *qui tam* provisions. ........................................................... 20

V.   CONCLUSION ......................................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

*Comdyne I, Inc. v. Corbin*, 908 F.2d 1142 (3d Cir. 1990) ........................................................ 1, 12

*Eastern Elec. Corp. of New Jersey v. Shoemaker Const. Co.*, 652 F. Supp. 2d 599
(E.D. Pa. 2009) ........................................................................................................................ 13

*Grand Union Co. v. United States*, 696 F.2d 888 (11th Cir. 1983) ............................................ 16

*Higgins v. Shenango Pottery Co.*, 256 F.2d 504 (3d Cir. 1958) .................................................. 16

*In re Baycol Prods. Litig.*, 732 F.3d 869 (8th Cir. 2013) ............................................................ 15

*J & J Sports Prod., Inc. v. Kim*, No. 14-1170, 2016 WL 1238223
(D. Del. Mar. 29, 2016) ........................................................................................................... 12

*Mortgages, Inc. v. U.S. District Court*, 934 F.2d 209 (9th Cir.1991) ........................................ 19

*Smith v. Carolina Med. Ctr.*, No. 11-2756, 2017 WL 3310694 (E.D. Pa. Aug. 2, 2017) ............ 15

*United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458 (5th Cir. 2009) ... 15, 19

*United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943) ........................................................ 14

*United States ex rel. Sansbury v. LB & B Assocs., Inc.*, 58 F. Supp. 3d 37 (D.D.C. 2014) .......... 19

*United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235 (3d Cir. 2004) .............................. 15

*United States ex rel. Thomas v. Siemens AG*, 593 Fed. App'x 139 (3d Cir. 2014) ...................... 15

*United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295 (3d Cir. 2011) ..... 14, 15

*United States v. Cooperative Grain & Supply Co.*, 476 F.2d 47 (8th Cir.1973) .......................... 19

*United States v. Di Mucci*, 879 F.2d 1488 (7th Cir. 1989) ........................................................ 13

*United States v. Kates*, 419 F. Supp. 846 (E.D. Pa. 1976) .......................................................... 19

*United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008) ................................................................ 18

**<u>TABLE OF AUTHORITIES (cont.)</u>**

*United States v. Sci. Applications Intern. Corp.*, 626 F.3d 1257 (D.C. Cir. 2010)...................... 18

*United States v. TXL Mortg. Corp.*, Civ. A. No. 15-1658 (JEB), 2016 WL 5108019
    (D.D.C. Sept. 20, 2016) ........................................................................................ 13

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
    136 S. Ct. 1989 (2016)......................................................................... 14, 15, 17, 18

**STATUTES AND REGULATIONS**

28 U.S.C. § 2461 ..................................................................................................... 20

31 U.S.C. § 3729 ............................................................................... 1, 14, 15, 18, 20

31 U.S.C. § 3730 ................................................................................................. 22, 23

31 U.S.C. § 3731 ..................................................................................................... 21

42 U.S.C. § 1395y..................................................................................................... 2

42 C.F.R. § 410.32 .................................................................................................... 3

**RULES**

Fed. R. Civ. Proc. 4................................................................................................... 1

Fed. R. Civ. Proc. 9................................................................................................. 17

Fed. R. Civ. Proc. 55........................................................................................... 12, 13

## I.     NATURE AND STAGE OF THE PROCEEDINGS

Relator Robin White ("Relator") commenced this action on June 21, 2013, by filing a *qui tam* Complaint pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733.  (D.I. 2.)  The United States intervened and filed a Complaint in Intervention on September 26, 2017.  (D.I. 28, 29.)  The same day, the Court directed the government to serve its Complaint on Defendants Orthopaedic and Neuro Imaging ("ONI") and Richard Pfarr ("Pfarr").  (D.I. 30.)

Defendants, through counsel, each signed a Waiver of the Service of Summons, pursuant to Federal Rule of Civil Procedure 4(d), and the government filed the completed waiver forms on October 17, 2017.  (D.I. 34, 35.)  Defendants' response was due on November 27, 2017.  Neither Defendant responded.  Accordingly, on December 27, 2017, the government requested the Clerk of Court to enter default.  (D.I. 36.)  The Clerk entered default against Defendants on January 5, 2018.  (D.I. 37.)  To date, Defendants have failed to answer or otherwise respond.[1]

## II.    SUMMARY OF THE ARGUMENT

Defendants violated the FCA when they submitted claims to Medicare for MRI services, knowing that the claims were not entitled to be paid.  The amount of damages is set by statute and is thus capable of ascertainment by the Court.  The Court should grant default judgment.

## III.   STATEMENT OF FACTS

Once a default is entered, the defaulting parties have no right to dispute liability; and on a motion for default judgment, the well-pled facts in the Complaint relating to liability are taken as true.  *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990).

### A.     Medicare Background

Medicare is a federal health insurance program for people 65 and older and for people

---

[1] On December 13, 2017, an attorney representing Defendants advised the government that Defendants had decided not to undertake any further defense of this action.

1

under 65 with certain disabilities.  Medicare is administered through the Centers for Medicare

and Medicaid Services ("CMS"), and administration is further delegated to government

contractors.  (D.I. 29 ("Gov't Compl.") at ¶ 7.)

In order to bill Medicare for services provided to Medicare beneficiaries, health care

providers must submit an enrollment application.  Medicare, through its administrative

contractor, evaluates the representations and certifications in the enrollment application and

determines whether to permit the provider to enroll.  Once a provider is approved, it can bill

Medicare and receive payment.  (*Id.* at ¶ 8.)

To obtain payment for the services they provide to Medicare beneficiaries, Medicare-

enrolled providers file "claims" with the Medicare administrative contractor.  The basic

requirement for a claim to be payable by Medicare is that the service must be "reasonable and

necessary for the diagnosis or treatment of illness or injury."  42 U.S.C. § 1395y(a)(1)(A).  (*Id.* at

¶ 10.)

When submitting claims to Medicare, providers use payment codes corresponding to the

services they provided.  These codes are commonly referred to as "Current Procedural

Terminology" or "CPT" codes.  By submitting claims using CPT codes, providers represent to

Medicare that they have provided the services corresponding to the codes.  (*Id.* at ¶ 11.)

Medicare authorizes providers called "independent diagnostic testing facilities," or

"IDTFs" to perform and bill for magnetic resonance imaging ("MRI") tests on Medicare

beneficiaries.  (*Id.* at ¶ 15.)  But it deems those tests to be "reasonable and necessary," and thus

reimbursable by Medicare, only if a physician supervises the procedure according to the

standards established by Medicare.  By definition, a test performed without the appropriate level

of physician supervision is not "reasonable and necessary," and therefore not payable by

2

Medicare.  42 C.F.R. § 410.32(b)  (*Id.* at ¶ 12.)

For diagnostic tests that involve some inherent risk of harm to the patient—including

MRI scans involving injection of contrast media to which the patient may have an adverse or

allergic reaction—Medicare requires IDTFs to provide "direct supervision" of the procedure.

Direct supervision means that a physician has to be "in the office suite and immediately available

to furnish assistance and direction" in the event of an adverse reaction.  42 C.F.R.

§ 410.32(b)(3)(ii).  CMS publishes a Medicare Physician Fee Schedule Database that contains a

listing of all diagnostic procedures that require direct supervision by a physician.  (*Id.* at ¶ 14.)

An IDTF's compliance with the direct supervision requirement is material to Medicare's

decision to pay for contrast MRI procedures.  (*Id.* at ¶ 18.)

To enroll in the Medicare program and thus be entitled to bill Medicare, an IDTF has

always been required to list "all supervising physician(s)" that it intends to use and provide

information to Medicare about the physician supervisors' qualifications.  *See, e.g.,* Medicare

Enrollment Application, Clinics/Group Practices and Certain Other Suppliers,

http://www.cms.hhs.gov/CMSforms/downloads/cms855b.pdf, at 35, 46-47 (last visited Aug. 7,

2017); *see also* 42 C.F.R. § 410.33(b)(2) (IDTFs must "evidence proficiency" of supervising

physicians).  Furthermore, each supervising physician must "certify" to the Medicare

administrative contractor the identity of each of the test types that s/he is going to supervise for

the IDTF.  If any changes are made to the supervisory physician staff, the IDTF certifies that it

will notify the Medicare administrative contractor of this change within 30 or 90 days, depending

on the type of change.  (*Id.* at ¶ 19.)

IDTFs must also agree in the Medicare enrollment application to comply with all

Medicare program instructions.  IDTFs must acknowledge that all such instructions are available

from the Medicare contractor and that payment is contingent upon compliance with all

applicable laws, regulations and program instructions.  (*Id.* at ¶ 20.)

### B.   **ONI Lewes**

Defendant Orthopaedic and Neuro Imaging LLC ("ONI") is a private Delaware limited

liability company formed in 2002.  ONI operates four IDTF locations in Delaware and Maryland,

which perform MRI services.  (*Id.* at ¶¶ 5, 23, 37, 48, 57.)  ONI is owned by Defendant Pfarr and

his wife, and Pfarr is the President.  (*Id.* at ¶ 6.)

ONI opened its first location in Lewes, Delaware in 2002.  Between October 2002 and

continuing through July 2014, employees at ONI's Lewes office injected hundreds of Medicare

beneficiaries with contrast material during the performance of contrast MRI procedures.

However, except for a short period of time in 2012, ONI provided no direct physician

supervision of contrast MRI procedures performed in its Lewes office.  ONI and Pfarr

nevertheless submitted claims for those procedures and received payment from Medicare.  (*Id.* at

¶¶ 23-36.)

The allegations in the government's Complaint establish that Defendants knew about the

supervision requirement when Pfarr enrolled ONI in Medicare in 2002, and they knew that ONI

was not in compliance.  Pfarr signed ONI's Medicare enrollment application and required

certifications as President and "Authorized Official" of ONI.  Those certifications, which were

set forth in all of the enrollment forms submitted by ONI and Pfarr, included the following:

- "My signature legally and financially binds this supplier to the laws, regulations, and program instructions of the Medicare program."
- "I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations and program instructions are available through the Medicare contractor."
- "I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions . . . ."

- "I agree to notify the Medicare contractor of any future changes to the information" contained in the application within 90 days (or 30 days for certain types of changes).
- "I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare . . . ."
- "[I] will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

The certifications put Pfarr and ONI on notice that they needed to comply with regulations or Medicare would not pay the claims. (*Id.* ¶¶ 25, 26.)

Despite knowing that unsupervised contrast MRI scans were not entitled to be paid, ONI and Pfarr began billing for them soon after ONI Lewes opened its doors in 2002. (*Id.* at ¶ 26.) In or around 2007, Relator White—who at the time worked at ONI in Lewes—asked Pfarr if ONI was in compliance with the direct supervision requirement. Pfarr lied and told White that Dr. Charles Stanislav, a general practice physician who had an office near ONI, was ONI's supervising physician. But in an interview with government investigators, Dr. Stanislav denied supervising any procedures for ONI or even being present in ONI's office suite during procedures. He further denied knowing that he was ONI's supervising physician. (*Id.* at ¶¶ 27, 34.)

Documents obtained during the government's investigation evidence ONI's and Pfarr's knowledge of ONI's non-compliance in Lewes, as well as their knowledge that the government considered the supervision requirement to be material. In an e-mail dated January 5, 2012, Pfarr acknowledged ONI's non-compliance, stating, "ONI was just informed that we have to revalidate all three facility's [sic], which means we re-submit all documents . . . A problem we need to address is designating radiologists as Direct Supervision – meaning they must be present in the office suite & immediately available to provide assistance throughout the performance of the procedure . . . ." (*Id.* at ¶ 28.) One week later, on January 12, 2012, ONI's third-party billing

service notified Pfarr that "[t]he government will clearly be reviewing supervision in regards to IDTFs" and that "we should talk about this in the near future." Pfarr responded that he "may have to punt on removing [Relator] Robin [White] from ONI until we can figure out how best to comply!" (*Id.* at ¶ 29.)

Shortly thereafter, on or about February 3, 2012, ONI submitted an application to re-enroll its Lewes office location in Medicare. The application listed Dr. Robert Platenberg as the direct supervision physician. Pfarr signed the enrollment application and required certifications. Subsequently, between approximately February 2012 and June 2012, Pfarr arranged to have Dr. Platenberg (who lived out of state) present in ONI's Lewes office on Thursdays to supervise contrast MRI procedures. (*Id.* at ¶ 30.) *See also* Exhibit A (Declaration of Special Agent Paul Rich) at ¶ 4.

Dr. Platenberg stopped directly supervising at the Lewes office before July 2012, and Pfarr knew it. But ONI and Pfarr did not hire a replacement or notify Medicare that Dr. Platenberg was no longer supervising. Starting in July 2012, ONI continued to perform and bill for contrast MRI procedures on Medicare beneficiaries at its Lewes office, but ONI provided no direct physician supervision. (Gov't Compl. at ¶ 31.) *See also* Exhibit A at ¶ 4.

On or about November 5, 2013, ONI submitted a form to Medicare indicating that ONI had changed its direct supervising physician at the Lewes office from Dr. Platenberg to Dr. Charles Stanislav, effective November 1, 2013. Pfarr signed the form and the required certifications. At or around the same time, ONI created a written agreement under which Dr. Stanislav would purportedly provide "on-site" supervision of contrast MRI procedures at ONI's Lewes office. Under the agreement, ONI was to provide Dr. Stanislav's Administrator with a schedule of contrast patients each week and would pay Dr. Stanislav a fee of $20.00 "per patient

exam" or $150.00 "[i]n the event that the supervising physician is needed to evaluate a patient." Pfarr signed the agreement on behalf of ONI.  (*Id.* at ¶¶ 32, 33.)

The government's investigation uncovered that ONI's written agreement with Dr. Stanislav in 2013 was a sham created to conceal the fact that ONI did not provide direct supervision at its Lewes location.  Dr. Stanislav told investigators that he was never present in ONI's office suite during contrast MRI procedures.  ONI never provided Dr. Stanislav or his employees with a schedule of contrast patients as required by the agreement.  ONI never paid Dr. Stanislav pursuant to the agreement.  Dr. Stanislav also told investigators that he was unaware that the supervision agreement with ONI had even commenced, since Pfarr never notified him that ONI was giving contrast injections.  (*Id.* at ¶ 34.)

Between July 1, 2003 (ten years prior to Relator's June 21, 2013 Complaint[2]) and June 30, 2014 (just before the government's investigation went overt), excluding the first two quarters of 2012 (spanning the time period when Dr. Platenberg supervised in Lewes), ONI filed 1,585 claims with Medicare for contrast MRI procedures performed in its Lewes office, totaling $995,305.79.  *See* Exhibit A at ¶ 7, Attachment 1.  (*See also* Gov't Compl. at ¶ 35.)

C.    **ONI Seaford**

In or around January 2005, ONI opened another office location in Seaford, Delaware. Beginning in January 2005 and continuing through July 2014, employees at ONI's Seaford office injected hundreds of Medicare beneficiaries with contrast material during the performance of contrast MRI procedures.  However, except for a short period of time in 2012, ONI provided no direct physician supervision of contrast MRI procedures performed in its Seaford Office.  (*Id.* at ¶ 37.)

---

[2] As set forth below, the limitations period for the FCA claim against ONI is ten years.

As described above, ONI and Pfarr knew that unsupervised contrast MRI scans were not entitled to be paid.  They nevertheless began billing Medicare for unsupervised scans soon after ONI Seaford opened its doors in 2005.  (*Id.*)

Like they had done in Lewes, ONI and Pfarr falsified Medicare enrollment forms in order to conceal ONI's non-compliance.  In or around March 2009, ONI submitted an application to Medicare to reactivate the enrollment for the Seaford office.  Although ONI's application stated that it would perform contrast MRI studies, it failed to list a physician for provision of direct supervision.  The Medicare administrative contractor informed ONI that, in order to complete processing of the enrollment application, ONI needed to identify a supervising physician "with the appropriate Supervision" for each type of test it proposed to perform.  On or about April 28, 2009, ONI submitted amended enrollment paperwork indicating that Dr. Robert Platenberg provided direct supervision at ONI's Seaford office.  Pfarr signed the enrollment application and required certifications for ONI's Seaford office. (*Id.* at ¶ 39.)

ONI's enrollment application listing Platenberg as the direct supervising physician was materially false.  In fact, ONI had never provided supervision of contrast MRI procedures in its Seaford office and Pfarr had no intent at that time to use Dr. Platenberg (who lived out of state) to provide direct supervision.   (*Id.*)

On or about the same day, Pfarr sent the Medicare administrative contractor a schedule of dates "assigned" in May 2009 for Dr. Platenberg to directly supervise contrast scans in ONI's Seaford office.  Pfarr's letter was fraudulent.  Dr. Platenberg told government investigators that he did not provide direct supervision at ONI's Seaford office in 2009, nor was he "assigned" to do so by ONI or Pfarr.  (*Id.* at ¶ 40.)

In or around February 2012, shortly after being notified that the government was

investigating IDTF compliance with supervision requirements, ONI submitted an application to re-enroll its Seaford office in Medicare.  The application stated that Platenberg would provide direct supervision.  Between approximately February 2012 and July 2012, Pfarr arranged to have Dr. Platenberg present in ONI's Seaford office on Fridays to supervise contrast MRI procedures for Medicare beneficiaries.  During this period, ONI scheduled Medicare beneficiaries undergoing contrast MRI procedures at its Seaford office for Fridays.  (*Id.* at 41.)

Dr. Platenberg stopped directly supervising in Seaford before July 2012, and Pfarr knew it.  ONI and Pfarr did not hire a replacement or notify Medicare that Dr. Platenberg was no longer supervising.  After July 2012, ONI continued to perform and bill for contrast MRI procedures on Medicare beneficiaries in Seaford, but ONI provided no direct supervision.  (*Id.* at ¶ 42.)  *See also* Exhibit A at ¶ 4.

On or about November 5, 2013, ONI submitted a form indicating that ONI had changed its direct supervising physician from Dr. Platenberg to Dr. Ivonne Herrera, effective November 1, 2013.  That representation was materially false.  In fact, ONI had not provided direct supervision of contrast MRI procedures in its Seaford office since approximately July 2012 and Pfarr had no intent to use Dr. Herrera to provide direct supervision of contrast MRI procedures.  Pfarr signed the form and the required certifications.  (Gov't Compl. at ¶ 43.)

At or around the same time, ONI created a written agreement with Dr. Herrera in Seaford similar to the one with Dr. Stanislav in Lewes.  According to the agreement, Dr. Herrera would provide "on-site" supervision of contrast MRI procedures at ONI's Seaford office.  ONI would provide Dr. Herrera a fee of $20.00 "per patient exam" or $150.00 "[i]n the event that the supervising physician is needed to evaluate a patient."  Pfarr signed the agreement on behalf of ONI.  (*Id.* at ¶ 44.)

9

Like its agreement with Dr. Stanislav, ONI's written agreement with Dr. Herrera was a sham created to conceal the fact that ONI did not provide direct physician supervision of contrast MRI procedures performed at its Seaford office.  Dr. Herrera told government investigators that she was never present in ONI's office suite during contrast MRI procedures.  Moreover, ONI never paid Dr. Herrera pursuant to the agreement.  (*Id.* at ¶ 45.)

Between January 1, 2005 (when the Seaford office opened) and June 30, 2014 (just before the government's investigation went overt), excluding the first two quarters of 2012 (spanning the time period when Dr. Platenberg supervised in Seaford), ONI filed 342 claims with Medicare for contrast MRI procedures performed in its Seaford office, totaling $197,248.64.  *See* Exhibit A at ¶ 8, Attachment 1.  (*See also* Gov't Compl. at ¶ 46.)

D.     **ONI Millsboro**

In 2008, Defendant ONI opened another office in Millsboro, Delaware.  Beginning in October 2008 and continuing through July 2014, employees at ONI's Millsboro office injected hundreds of Medicare beneficiaries with contrast material during the performance of contrast MRI procedures.  However, ONI generally provided no direct physician supervision of contrast MRI procedures performed in its Millsboro Office.  ONI and Pfarr nevertheless submitted or caused to be submitted claims for those procedures to Medicare.  (Gov't Compl. at ¶ 48.)

Like they had done in Lewes and Seaford, ONI and Pfarr falsified Medicare enrollment forms in order to conceal ONI's non-compliance.  In or around November 2008, ONI submitted an application to Medicare to enroll its Millsboro office.  The application did not list a physician for provision of direct supervision.  On December 1, 2008, the Medicare administrative contractor informed ONI that, in order to process its enrollment application, ONI needed to identify a supervising physician "with the appropriate Supervision" for each type of test it proposed to perform.  On or about December 15, 2008, ONI submitted amended enrollment

10

paperwork indicating that Joseph Inzinna would provide direct supervision.  Pfarr signed the enrollment application and required certifications for ONI's Millsboro office.  (*Id.* at ¶ 49.)

That enrollment form was materially false.  Dr. Inzinna told government investigators that he did not provide direct supervision at ONI's Millsboro office, nor has he ever even visited that office.  ONI continued to perform and bill for contrast MRI scans from October 2008 until February 2012.  (*Id.* at ¶¶ 49, 50.)

In or around February 2012, shortly after being notified that the government was investigating IDTF compliance with supervision requirements, ONI generally stopped performing contrast MRI procedures to Medicare beneficiaries at its Millsboro office.  (*Id.* at ¶ 51.)

In or around November 2013, ONI created a sham supervision agreement with Dr. Fadi Damouni for the Millsboro location.  Once again, Pfarr signed the agreement on behalf of ONI. Like the others, this agreement was a sham created to conceal the fact that ONI did not provide direct physician supervision of contrast MRI procedures performed at its Millsboro office.  Dr. Damouni told investigators that he was never present in ONI's office suite during contrast MRI procedures.  ONI never provided Dr. Damouni or his employees with a schedule of contrast patients as required by the agreement.  ONI never paid Dr. Damouni pursuant to the agreement. Moreover, Dr. Damouni was unaware that the supervision agreement with ONI had commenced until one of his own patients underwent a contrast MRI procedure in or around July 2014.  (*Id.* at ¶¶ 53, 54.)

Between the fourth quarter of 2008 (when the Millsboro office opened) and June 30, 2014 (just before the government's investigation went overt), ONI filed 226 claims with Medicare for contrast MRI procedures performed in its Millsboro office, totaling $111,995.12.

*See* Exhibit A at ¶ 9, Attachment 1.   (*See also* Gov't Compl. at ¶ 55.)

      E.    **ONI Salisbury**

In 2012, Defendant ONI opened an office in Salisbury, Maryland.  Beginning in June

2012 and continuing through July 2014, employees at ONI's Salisbury office injected Medicare

beneficiaries with contrast material during the performance of contrast MRI procedures.

However, ONI generally provided no direct physician supervision of contrast MRI procedures

performed in its Salisbury Office.  ONI and Richard Pfarr nevertheless submitted or caused to be

submitted claims for those tests to Medicare.  (Gov't Compl. at ¶ 57.)

ONI and Pfarr also falsified the Medicare enrollment form for the Salisbury office.  The

form listed Dr. Donald Wood as the physician providing direct supervising physician.  Pfarr

signed the enrollment application and required certifications.  However, ONI and Pfarr had no

intent to use Dr. Wood to provide direct supervision of contrast MRI procedures.  ONI and Pfarr

also created a sham supervision agreement for its Salisbury location.  (*Id.* at ¶¶ 58-60.)

Between June 2012 (when the Salisbury office opened) and June 30, 2014 (just before the

government's investigation went overt), ONI filed 72 claims with Medicare for contrast MRI

procedures performed in its Salisbury office, totaling $23,980.91.  *See* Exhibit A at ¶ 10,

Attachment 1.  (*See also* Gov't Compl. at ¶ 61.)

    **IV.    ARGUMENT**

Once default has been entered by the Clerk of Court under Rule 55(a), the plaintiff may

apply to the court for default judgment under Rule 55(b).  *J & J Sports Prod., Inc. v. Kim*, No. 14-

1170, 2016 WL 1238223, at *1 (D. Del. Mar. 29, 2016); Fed. R. Civ. Proc. 55.  At this stage, the

factual allegations set forth in the complaint must be taken as true, except those related to the

amount of damages.  *Comdyne*, 908 F.2d at 1149.

As to damages, the Court must make a determination of the sum to be awarded, which may be based on affidavits or documentary evidence.  *See* Fed. R. Civ. Proc. 55(b); *United States v. Di Mucci*, 879 F.2d 1488, 1497 (7th Cir. 1989) (explaining that a default judgment may be entered without an evidentiary hearing on damages so long as the amount of damages is "capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits"); *Eastern Elec. Corp. of New Jersey v. Shoemaker Const. Co.*, 652 F. Supp. 2d 599 (E.D. Pa. 2009) ("The Court is under no requirement to conduct an evidentiary hearing with testimony, but, rather, such a hearing may be one in which the court asks the parties to submit affidavits and other materials from which the court can decide the issue." (internal marks and citation omitted)).

The well-pled allegations of the Complaint establish that Defendants are liable under the FCA.  Defendants' damages are calculated according to statute, and are thus capable of ascertainment from the affidavit submitted with the government's motion.  *See United States v. TXL Mortg. Corp.*, Civ. A. No. 15-1658 (JEB), 2016 WL 5108019, at *1-3 (D.D.C. Sept. 20, 2016) (entering default judgment in favor of the United States on FCA claim based on government's submission of affidavit supporting its damages claim).  Accordingly, entry of default judgment under Rule 55(b) is appropriate.

A.     **The allegations in the government's Complaint establish liability under the FCA.**

The government requests default judgment on Count One, which alleges a violation of 31 U.S.C. § 3729(a)(1)(A) (formerly § 3729(a)(1)).  That section imposes civil liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  § 3729(a)(1)(A).

13

A violation of § 3729(a)(1)(A) has four elements: (1) the defendant presented or caused to be presented a claim for payment; (2) the claim was false or fraudulent; (3) the defendant knew the claim was false or fraudulent," *United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 304-05 (3d Cir. 2011); and (4) the misrepresentation was "material to the government's payment decision," *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016). *See also United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 761-63 (3d Cir. 2017) (holding that the elements of § 3729(a)(1)(A) and former § 3729(a)(1) (pre-2009) are the same).

The well-pled allegations in the Government's Complaint satisfy each of those elements.

### 1. Defendants presented or caused to be presented claims for payment.

Medicare claims are "claims" under the FCA.[3] *See, e.g., Wilkins*, 659 F.3d 295, 307, 313-14 (allegation that defendant submitted false Medicare claims stated an FCA claim, citing cases). Defendant ONI's submission of claims for payment to Medicare for contrast MRI services satisfies this first element. (Gov't Compl. at ¶¶ 35-36, 46-47, 55-56, 61.)

Defendant Pfarr also satisfies this element because he "cause[d]" ONI to submit claims to Medicare. (*Id.*) 31 U.S.C. § 3729(a)(1)(A); *see also United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544-45 (1943) ("[The FCA] provisions, considered together, indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were

---

[3] Under the FCA, the term "claim" includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that— (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor . . . if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government . . . (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2).

grounded in fraud, without regard to whether that person had direct contractual relations with the government."); *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242-44 (3d Cir. 2004) (holding that an individual defendant may be liable under the FCA even though an entity submitted the false claim).

## 2. The claims were false.

A claim can be "false" within the meaning of the FCA under multiple legal theories. *See, e.g., Wilkins*, 659 F.3d at 305-07 (describing theories). Under the "implied false certification" theory, a defendant is liable for presenting (or causing the presenting of) a claim to the government without disclosing that it violated regulations that affected its eligibility for payment. *Escobar*, 136 S. Ct. at 2000-01 (adopting the implied false certification theory of FCA liability); *see also Wilkins*, 659 F.3d at 305-06. According to this theory, the submission of claims for payment using CPT codes that correspond to specific medical services amounts to a representation that those services were provided in compliance with statutory, regulatory, and contractual requirements. *Escobar*, 136 S. Ct. at 2000-01. If those requirements were not complied with, the claims are "false" within the meaning of the FCA. *Id.*

Here, ONI and Pfarr submitted (and caused the submission of) Medicare claims for specific contrast MRI services using CPT codes, despite the fact that those services did not comply with statutory and regulatory requirements for direct physician supervision. (Gov't Compl. at ¶¶ 11, 14, 17, 35-36, 46-47, 55-56, 61.) Under the implied false certification theory, those claims were false.[4]

---

[4] Many of the claims are also false under a fraud-in-the-inducement theory. Under that theory, the FCA is violated if claims for payment are submitted to the government under a contract initially caused by fraud, even if the claims themselves are not fraudulent. *United States ex rel. Thomas v. Siemens AG*, 593 Fed. App'x 139, 143 (3d Cir. 2014); *In re Baycol Prods. Litig.*, 732 F.3d 869, 876 (8th Cir. 2013); *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467–68 (5th Cir. 2009); *Smith v. Carolina Med. Ctr.*, No. 11-2756, 2017 WL 3310694,

### 3.  Defendants knew the claims were false.

"Knowledge" under the FCA is defined by statute, and means either (i) "actual knowledge," (ii) "deliberate ignorance," or (iii) "reckless disregard."  31 U.S.C. § 3729(b)(1). Specific intent to defraud is not required.  *Id.*

The Complaint alleges that Defendant Pfarr had actual knowledge of the direct supervision requirement and actual knowledge that ONI was violating it.  (Gov't Compl. at ¶¶ 26, 35, 46, 55, 61)  Indeed, not only has the United States pled Pfarr's scienter generally (as it is permitted to do under the Rules, Fed. R. Civ. Proc. 9(b)) but it has pled facts—gleaned from Medicare enrollment forms, witness interviews, and ONI documents—that establish Pfarr's knowledge.  (*Id.* at ¶¶ 24-36, 39-45, 49-55, 58-61.)  This was not a mistake or a misunderstanding: Pfarr knew the rules, he knew that ONI was violating them, he lied to Medicare to try to get around them, and he created sham physician supervision agreements as a cover.

The scienter element is also satisfied for Defendant ONI because Pfarr's knowledge is imputed to ONI.  *See, e.g., Grand Union Co. v. United States*, 696 F.2d 888, 891 (11th Cir. 1983) (holding in an FCA case that employee's knowledge is imputed to a corporation when the employee acts for the benefit of the corporation and within the scope of his employment); *Higgins v. Shenango Pottery Co.*, 256 F.2d 504, 509 (3d Cir. 1958) ("[I]t is a rule of agency that the knowledge of the agent is imputed to the principal in connection with any transaction

---

*5-7 (E.D. Pa. Aug. 2, 2017) (holding that false statements in Medicare enrollment forms can create FCA liability under a fraudulent inducement theory).  Here, Medicare told ONI and Pfarr that ONI could not enroll MRI locations without listing a direct supervising physician on its enrollment form; otherwise, ONI could not file claims for contrast MRI procedures.  (Gov't Compl. at ¶¶ 39-40, 49.)  Faced with this obstacle, Pfarr lied on the enrollment forms about having direct supervising physicians.  (*Id.*)  ONI's subsequent claims for contrast MRI procedures were therefore false.

16

conducted by the agent in behalf of his principal.").

### 4.  Defendants' misrepresentations were material.

When a claim under § 3729(a)(1)(A) is based on non-compliance "with a statutory, regulatory, or contractual requirement," the requirement "must be material to the Government's payment decision in order to be actionable under the False Claims Act."  *Escobar*, 136 S. Ct. at 1996.  Materiality is satisfied (i) if a reasonable person would attach importance to the false representation in determining his or her choice of action in the transaction; or (ii) if the defendant knew or had reason to know that the recipient of the representation would attach importance to the specific matter in determining his or her choice of action.  *Id.* at 2002-03.  The government's decision to expressly identify a statutory or regulatory requirement as a condition of payment is evidence of materiality.  *Id.* at 2003.  As is evidence that the defendant knows that the government will refuse to pay based on non-compliance with the requirement.  *Id.*

Here, the government's Complaint—which must be taken as true—alleges that the direct supervision requirement was material to Medicare's decision to pay for contrast MRI services. (Gov't Compl. at ¶ 18.)  The Complaint also alleges specific facts that establish materiality.  As explained above, Medicare statutes and regulations make clear that the direct supervision requirement is a condition of payment.  (*Id.* at ¶¶ 12, 14.)  The facts also show that Pfarr knew that Medicare attached specific importance to compliance with this requirement.  Pfarr was aware that the government was investigating IDTFs for failure to provide appropriate supervision.  (*Id.* at ¶ 28-29, 41.)  In addition, when Pfarr tried to enroll ONI's Seaford and Millsboro offices in Medicare, Medicare told him that ONI could not bill for MRI procedures requiring direct supervision unless it amended its enrollment form to identify the direct supervising physician.  (Pfarr later lied on the form and also provided Medicare a false supervision "schedule.")  (Gov't Compl. at ¶¶ 39-40, 49.)  Then, after learning that the

17

government was investigating MRI providers for non-compliance with the supervision requirement, Pfarr created sham supervision agreements with physicians.  (*Id.* at ¶¶ 33-34, 44-45, 53-54, 59-60.)

In short, the facts show that Pfarr (and therefore ONI) was well aware that the government attached "particular importance" to the supervision requirement and would not pay if it was not complied with.  *See Escobar*, 136 S. Ct. at 2002-03 (requirement is "material" if the defendant knows that the government would refuse to pay based on noncompliance).  The materiality element is satisfied.

> **B.**     **The treble damages and civil penalties sought by the government are capable of ascertainment by the Court.**

The amount of damages in an FCA case is set by statute and is therefore capable of ascertainment by the Court without the need for an evidentiary hearing.  Once the Government establishes liability, the FCA mandates that the Court award treble damages and not less than $5,500 in civil penalties for each false claim.  31 U.S.C. § 3729(a)(1).[5]

In FCA cases involving Medicare—where the beneficiary is a third-party, not the government itself—the single damages are the entire amount the government paid for the false claims.  *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) (holding that FCA damages for Medicare claims were the full amount of the claims); *see also United States v. Sci. Applications Intern. Corp.*, 626 F.3d 1257, 1280 (D.C. Cir. 2010) ("[W]here the defendant fraudulently sought payments for participating in programs designed to benefit third-parties rather than the government itself, the government can easily establish that it received nothing of

---

[5] Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the FCA civil penalties were adjusted to a range of $5,500 to $11,000 per violation for violations occurring on or after September 29, 1999.

value from the defendant and that all payments made are therefore recoverable as damages."); *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 473 (5th Cir. 2009) (calculating damages as the amount the government paid to the defendants where "[t]he contracts entered . . . did not produce a tangible benefit" to the government).

The single damages in this case are therefore the full value of the payments Medicare made to ONI for contrast MRI services that were not properly supervised by a physician between July 1, 2003 (ten years prior to Relator's June 23, 2013 Complaint against ONI[6]) and June 30, 2014, which is $1,328,530.46. *See* Exhibit A at ¶¶ 7-11, Attachment 1. Trebling that figure yields $3,985,591.38. (*Id.*) The Court is also statutorily required to award a minimum of $5,500 per false claim in civil penalties. ONI submitted a total of 2,225 claims for contrast MRI services that were not properly supervised during the relevant time period, which yields a total of $12,237,500 in civil penalties. (*Id.*) The total recovery against ONI is $3,985,591.38 + $12,237,500 = $16,223,091.38. (*Id.*)

Defendant Pfarr is jointly and severally liable with ONI under the FCA. *See Mortgages, Inc. v. U.S. District Court*, 934 F.2d 209, 212 (9th Cir.1991); *United States v. Cooperative Grain & Supply Co.*, 476 F.2d 47, 64 (8th Cir.1973) (individual and corporation jointly and severally liable under FCA for the total treble damages and civil penalties); *United States v. Kates*, 419 F. Supp. 846, 854–55 (E.D. Pa. 1976). Pfarr was not added as a defendant until the government filed its Complaint in September 2017 but he signed tolling agreements that excluded the time

---

[6] There is a ten-year limitations period for FCA actions in which the government intervenes when the government did not know about the allegations more than three years prior to the Relator's Complaint. 31 U.S.C. § 3731(b)(2); *United States ex rel. Sansbury v. LB & B Assocs., Inc.*, 58 F. Supp. 3d 37, 47-52 (D.D.C. 2014); Exhibit A at ¶ 2. Moreover, the Government's Complaint in Intervention relates back to the date of the Relator's Complaint because they arise out of the same conduct. 31 U.S.C. § 3731(c); *Sansbury*, 58 F. Supp. 3d at 47-52. (D.I. 1, 29.)

19

after September 23, 2016 from the limitations period.  *See* Exhibits B, C, D.  Accordingly, giving

Pfarr the benefit of the minimum six-year limitations period, 31 U.S.C. § 3731(b)(1), the single

damages against Pfarr are the total of the unsupervised contrast MRI payments between October

1, 2010 (six years prior when Pfarr was named as a defendant on September 23, 2016) and June

30, 2014.  That total is $426,815.71, which is trebled to $1,280,447.13.  *See* Exhibit A at ¶ 12,

Attachment 2.  ONI submitted a total of 881 claims for improperly supervised services during

that period, yielding $4,845,500 in statutorily-required civil penalties.  (*Id.*)  Thus, Pfarr is jointly

and severally liable for a minimum of $6,125,947.13.  (*Id.*)

C.      **The government and Relator agree that Relator should receive an 18-percent share under the FCA's *qui tam* provisions.**

Pursuant to the FCA's *qui tam* provisions, a relator is entitled to a share of the recovery if

the government intervenes. 31 U.S.C. § 3730. Specifically, Section 3730(d)(1) provides:

> If the Government proceeds with an action brought by a person
> under subsection (b), such person shall, subject to the second
> sentence of this paragraph, receive at least 15 percent but not more
> than 25 percent of the proceeds of the action or settlement of the
> claim, depending upon the extent to which the person substantially
> contributed to the prosecution of the action.

31 U.S.C. § 3730(d)(1). Here, the Government and Relator agree that Relator should receive an

18-percent share of any recovery collected from ONI and Pfarr.

V.      **CONCLUSION**

For the foregoing reasons, the United States and Relator respectfully request that the

Court enter default judgment on Count One of the Government's Complaint against ONI for

$16,223,091.38, with Pfarr jointly and severally liable for $6,125,947.13.  A proposed order is

attached.

Respectfully submitted,

DAVID C. WEISS
Acting United States Attorney

By:   /s/ Jennifer L. Hall
       Jennifer L. Hall (#5122)
       Laura Hatcher (#5098)
       Assistant United States Attorneys
       1007 N. Orange Street, Suite 700
       Wilmington, Delaware 19801
       (302) 573-6277

DATED:  January 12, 2018

**<u>CERTIFICATE OF SERVICE</u>**

I, Kimberly Rechner, an employee in the Office of the United States Attorney for the

District of Delaware, hereby attest under penalty of perjury that on January 12, 2018, a true copy

of BRIEF OF UNITED STATES IN SUPPORT OF UNITED STATES' AND RELATOR'S

JOINT MOTION FOR DEFAULT JUDGMENT AND TO SET RELATOR'S SHARE was

electronically filed and was also mailed to the following:


Richard Pfarr
424 Kings Highway
Lewes, DE 19958

Orthopaedic and Neuro Imaging LLC
c/o Richard C. Pfarr, Registered Agent
424 Kings Highway
Lewes, DE 19958

Edmund D. Lyons, Esq.
1526 Gilpin Ave
Wilmington, DE 19806

Adam Balick, Esq.
Balick & Balick, LLC
711 King Street
Wilmington, DE 19801


/s/ Kimberly Rechner
Kimberly Rechner